UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VONETTA MEADOWS,

     Plaintiff,                               Case No. 13-cv-11926
                                              Hon. Matthew F. Leitman

v.

WAHLER AUTOMOTIVE
SYSTEMS, INC.,

     Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF #14)

## INTRODUCTION

In this action, Plaintiff Vonetta Meadows ("Meadows"), a former employee of Defendant Wahler Automotive Systems, Inc. ("Wahler"), claims that Wahler subjected her to a hostile work environment and unlawfully terminated her employment in retaliation for her filing of a discrimination charge with the Michigan Department of Civil Rights (the "MDCR") and the United States Equal Employment Opportunity Commission (the "EEOC"). Wahler denies Meadows' allegations and has moved for summary judgment.  For the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** Wahler's motion.

# FACTUAL BACKGROUND

**A.    The Alleged Harassment**

Wahler manufactures automotive thermostats and other products. (Deposition of Wahler Vice President Jerry Howe ("Howe"), ECF #14-2 at 25-27, Pg. ID 120-122.)  In July 2010, Advanced Staffing, an employment agency, hired Meadows and assigned her to work at Wahler as a temporary employee.  (*See, e.g.,* Meadows Dep., ECF #14-3 at 10-11, Pg. ID 153.)  In December 2010, Wahler hired Meadows directly on a permanent basis.  Meadows worked on Wahler's assembly line as both an "inspector" and a "machine operator."  (*Id.* at 12-13, Pg. ID 153.)  Paul Belleperche ("Belleperche"), Wahler's plant manager, supervised Meadows.  (*Id.* at 24, Pg. ID 155; *see also* Howe Dep., ECF #15-13 at 31, Pg. ID 329.)

Meadows says that between October and December 2010 Belleperche sexually harassed her "every single day." (Meadows Dep. at 55, Pg. ID 163). Meadows alleges that Belleperche's harassment included the following:

- Belleperche told Meadows that she had "a nice ass [a]ll the time" and got "very upset" if Meadows did not "give him any attention."  (Meadows' Handwritten Notes, ECF #15-2 at 3, Pg. ID 256; *see also* Meadows Dep. at 66, Pg. ID 166);

- Belleperche stared at Meadows' rear end and told her "to lift up [her] shirt because he wanted to look at [her] butt."  (ECF #15-2 at 4-5, Pg. ID 257-258; *see also* Meadows Dep. at 73-74, Pg. ID 168);

2

- Belleperche "approached [Meadows] with a dollar bill and tried to put the dollar bill in [her] pocket" – as a patron would do in a strip club – and he did so in front of Meadows' co-workers.  (ECF #15-2 at 4, Pg. ID 257; *see also* Meadows Dep. at 68, Pg. ID 166);

- Belleperche brushed against Meadows' breast as he was placing something in a refrigerator.  (*See* ECF #15-2 at 3, Pg. ID 256; *see also* Meadows Dep. at 65, Pg. ID 165);

- Belleperche fed Meadows crackers in front of her co-workers even though Meadows told Belleperche she didn't want to eat any crackers.  (*See* ECF #15-2 at 4, Pg. ID 257; *see also* Meadows Dep. at 67, Pg. ID 166);

- Belleperche told Meadows that he had "all kinds of nuts" in a Christmas gift box but that his "nuts" were "too big to fit in that box."  (ECF #15-2 at 5, Pg. ID 258; *see also* Meadows Dep. at 74-75, Pg. ID 168);

- Belleperche "pulled on [Meadows'] belt loop more than once" even though she told "him [to] stop doing that."  (ECF #15-2 at 2, Pg. ID 255; *see also* Meadows Dep. at 61, Pg. ID 164);

- Belleperche asked Meadows to go to Brazil, offered to buy her lunch, and asked her to go to a bar after work "to have a couple drinks."  (ECF #15-2 at 2, Pg. ID 255; *see also* Meadows Dep. at 57-58; Pg. ID 163-164); and

- Belleperche texted Meadows on her personal cell phone on multiple occasions.  (*See* ECF #15-2 at 2, Pg. ID 255; *see also* Meadows Dep. at 59-60, Pg. ID 164.)[1]

---

[1] Wahler has proffered benign explanations for many of Belleperche's purported comments and actions.  For instance, Wahler justifies Belleperche's request that Meadows travel to Brazil with him on the ground that "Wahler has a facility in Brazil." (Wahler Br., ECF #14 at 4, Pg. ID 95.)  Likewise, Wahler explains that while Belleperche offered to buy Meadows lunch, he "also bought other workers lunch." (*Id.* at 5, Pg. ID 96.)  But, on summary judgment, the Court must view Meadows' allegations in the light most favorable to her.

3

Meadows repeated throughout her deposition that Belleperche's harassment was continuous and relentless. She insisted that his misconduct occurred "every single day … from the time [she] walked in until the time [she] went home." (*Id.* at 75-76, Pg. ID 168; s*ee also id.* at 61, Pg. ID 164 (testifying that Belleperche "always pulled on my belt loop"); *id*. at 66, Pg. ID 166 (testifying that Belleperche would stare at her and make offensive comments "every single day"); *id*. at 75-56, Pg. ID 168 (testifying that Belleperche would "always" tell her how he felt about her "every single day").) Meadows says that the sexual harassment "died down" in December 2010, but she insists that Belleperche "still messed with [her] every single day" even after that time. (Meadows Dep. at 86, Pg. ID 171.)

Meadows also asserts that she heard "racial comments [] while working." (ECF #15-2 at 5, Pg. ID 258.) However, she was able to identify only a few such comments. As one example, Meadows claims that Belleperche said that the different ethnicities of Wahler's employees made it "like a rainbow in here." (*Id.*) Meadows could not identify or remember any other racial comments Belleperche made, but she insists that he said "a lot of racial things … that [she] didn't like." (Meadows Dep. at 78, Pg. ID 169.)

## B.   Meadows Receives Wahler's Anti-Harassment Policy

When Wahler hired Meadows as a permanent employee in December 2010, it gave her a copy of its employee handbook. (*See id.* at 11, Pg. ID 153; *see also*

4

the "Wahler Handbook," ECF #14-4.)  The Wahler Handbook contained an "anti-harassment" policy (the "Policy").  (*See id.* at 10-11, Pg. ID 183-184.)   In the Policy, Wahler "affirm[ed] its commitment to provide a work environment free from intimidation and harassment.  Abuse of the dignity of anyone though ethnic, racist or sexual slurs or though other derogatory or objectionable conduct is offensive employee behavior."  (*Id.* at 10, Pg. ID 183.)  The Policy warned Wahler employees that "[if] you harass another employee of the Company … because of race, religion, creed, color, national origin, ancestry, physical or mental disability, medical condition, marital status, sex, age, wright, heights, or any other protected classification … you will be subject to disciplinary action, including discharge."  (*Id.*)  With respect to sexual harassment, the Policy further provided:

> Sexual harassment is a form of sex discrimination … It is the express policy of [Wahler] that sexual harassment of employees … by you or agents of the company, is unacceptable and will not be tolerated.  Unwelcome or unwanted sexual advances, requests for favors or other visual, verbal or physical conduct will be deemed sexual harassment when:
>
> [….]
>
> (3) Such behavior has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment.

(*Id.*)

The Policy also instructed Wahler employees to raise instances of harassment promptly with management in an informal manner:  "Likewise, if you

5

feel you have been the object of harassment or intimidation based upon the aforementioned, you are to institute the procedures indicated below." (*Id.*) These "procedures" required:

> (1) Any employee who believes he or she has been the subject of illegal harassment should report the alleged act(s) promptly (within two working days) to his/her immediate supervisor and Resident Vice-President giving details as related to the complaint.
>
> (2) [Wahler], upon receipt of the complaint, shall take immediate and appropriate steps to investigate the complaint. Confidentiality is mandatory to the maximum extent possible, but cannot be guaranteed.
>
> (3) Following the investigation of the complaint, [Wahler] shall weigh the facts and determine the validity of the charge.  If the complaint is determined to be valid, the offender(s) shall face immediate and appropriate disciplinary action based upon the severity of the charge. This may include written warning and/or suspension and/or discharge.   If the offender is a supervisor he/she may be demoted.  If the complaint is found invalid, the complaint party may [submit a written request for review of the complaint … to the President and/or his designee].

(*Id.*)  Finally, the Policy detailed "a formal procedure" that Wahler employees could follow "where [a] complaint has not been satisfactorily resolved [by the] informal [process]." (*Id.* at 11, Pg. ID 184.)

## C.   Meadows Eventually Informs Wahler That Belleperche Harassed Her, and Wahler Investigates and Responds to Her Claims

Around the time that Wahler hired Meadows as a permanent employee, Meadows began secretly tape recording her Wahler co-workers.  (*See* Meadows

Dep. at 26-29, Pg. ID 156.)  Meadows says that she made these recordings to document the "sexual harassment [and] racial comments" she was experiencing and hearing.  (*Id.* at 26, Pg. ID 156.)  Meadows testified that in one of these recordings, Wahler employee Dee Manakis ("Manakis"), a Caucasian woman, made negative comments about Meadows that made Meadows "mad." (*See id.* at 34-37, Pg. ID 158.)

On March 14, 2011, Meadows argued with Manakis about the recorded conversation.  (*Id.* at 36-37, Pg. ID 158.)  During the argument, Belleperche "came over … told [Meadows and Manakis] to quit arguing or stop talking and do [their] work."  (*Id.* at 40, Pg. ID 159.)  However, Meadows and Manakis continued to argue, and Belleperche told Meadows – but not Manakis – "to leave" Wahler's facility.  (*Id.* at 42-44, Pg. ID 160.)

Less than twenty-four hours later, Meadows returned to Wahler's offices and delivered to Wahler Vice-President Jerry Howe a set of handwritten notes that detailed the alleged harassment by Belleperche described in section A above. (*See id.* at 50-51, Pg. ID 162; *See also* ECF #15-2.)  Meadows had largely completed the notes in "December of 2010," but she did not provide them to Wahler until the incident with Manakis. (*Id.* at 51-53, 57 Pg. ID 162-163.)  Nor, prior to that time, had Meadows otherwise informed Wahler that Belleperche was allegedly harassing her. (*Id.*)

Meadows' claims of harassment "came as a complete surprise" to Howe, and he "needed more time to sort [her allegations] out." (Howe Dep. at 96-97, Pg. ID 145-146.) Howe told Meadows to stay away from Wahler's offices and plant while he looked into her allegations. (*See id.*)

Howe says that he then "immediately took action to begin a process to find out what the heck [was] going on." (*Id.* at 96-98, Pg. ID 145-147.) As part of this "process," Howe hired an outside investigator – attorney Jonathon A. Young ("Young") – to review Meadows' allegations. (*Id.* at 96-97, Pg. ID 145-146.) Howe "wanted somebody else to come in and make evaluations." (*Id.*)

On March 16, 2011, only two days after Meadows first informed Howe of Belleperche's harassment, Young began interviewing "numerous present and former Wahler employees," including Meadows. (*See* ECF #14-7 at 2, Pg. ID 195.) Young investigated both the Meadows/Manakis incident and Meadows' allegations of harassment.

Young ultimately determined that "some of [Meadows'] allegations were not supported or were inconclusive, while others were substantiated." (*Id.* at 4, Pg. ID 197.) For example, Young found that Belleperche "engaged in or allowed inappropriate conduct to occur…" (*Id.* at 5, Pg. ID 198.) Young also concluded that Belleperche "likely … [made] sexual and racial jokes/comments" and "blurred the line between management and the hourly workers and inadvertently created a

8

work environment that lacks professionalism." (*Id.* at 3, Pg. ID 196.)  Even though Young did not believe such conduct "rose to the level of creating a hostile work environment," Young nevertheless recommended that Howe instruct Belleperche that "[t]his kind of conduct by someone in [Belleperche's] position of authority is absolutely unacceptable." (*Id.*)

Following receipt of Young's report, Howe took numerous actions.  First, Howe directed Belleperche – both orally and in a memorandum placed in Belleperche's personnel file – to immediately stop "any sexual or racial jokes/comments;" to "eradicate" such comments from Wahler's workplace; to "attend training regarding unlawful harassment;" and to "not retaliate against [Meadows]" for making her complaints.  (*See* ECF #14-8.)  Howe also told Belleperche that if Belleperche violated Wahler's "anti-harassment policy [in the future]…his employment [would] be terminated." (*Id.*)

Second, Howe scheduled a training session for all Wahler employees with the MDCR.  The session focused on sexual discrimination and sexual harassment. (*See* Meadows Dep. at 89-90, Pg. ID 171-172). All Wahler employees – including Belleperche – attended this training session. (*See id.*)

Finally, Howe wrote to Meadows. (*See* ECF #14-9 at 2, Pg. ID 214.)  Howe first told Meadows that he found her harassment allegations "quite disturbing but also very puzzling." (*Id.* at 2, Pg. ID 214.)  Howe was puzzled because Meadows

9

had never before mentioned any "incidents of sexual harassment, hostile environment, or any other activity that would make [Meadows] or any other employee feel threatened or uncomfortable in the workplace…" (*Id.*)

Howe also told Meadows that after reviewing the results of Young's "impartial and unbiased investigation," he (Howe) had concluded that Meadows had "instigated the confrontation" with Manakis and that her "actions were seriously disruptive and threatening." (*Id.*)   Howe reminded Meadows that "[i]ssues with co-workers are to be reported to the Production Manager in accordance with the requirements outlined in the [Wahler] Handbook."   (*Id.*) Howe also told Meadows that Young's investigation had substantiated some, but not all, of Meadows' allegations of harassment by Belleperche.  (*Id.* at 2-3, Pg. ID 214-215.)   Howe assured Meadows that as a result of Young's investigation, Wahler was taking steps to "enforce [its anti-harassment] policies … with increased vigilance."  (*Id.* at 5, Pg. ID 216.)

Howe then wrote that "[a]fter giving the matter much thought," Wahler was "willing to give [Meadows] an opportunity to return to work" even though Meadows had started the confrontation with Manakis, had been secretly tape recording her co-workers, and had failed to comply with the reporting requirements in the Policy.  (*Id.* at 3, Pg. ID 215.)  Howe told Meadows that she could "move [] to the afternoon shift" – during which Belleperche did not work – if

10

that would make her more comfortable.  (*Id.* at 5, Pg. ID 216.)  But Howe also told

Meadows that she would have to agree to a number of conditions if she wished to

return to work, including that:

- "[T]hreatening conduct [was] absolutely unacceptable" and "if [she] felt that a coworker [was] picking on [her]" that Meadows would "immediately direct [her] complaint to [her] Production Manager."  (*Id.* at 3, Pg. ID 215.);

- Any threatening outburst or insubordination to superiors or coworkers would result in immediate termination of her employment.  (*See id.*);

- She would not make any "audio or video recordings anywhere or anytime on [Wahler] property…" (*Id.*); and

- If she "witness[ed] any sexual or hostile comments/jokes in the future, or [if she] experience[d] retaliation or any harassment or discriminatory conduct, [that she would] follow the anti-harassment policy set forth in the [Wahler Handbook] and immediately report the incident to the Senior Company Manager."  (*Id.*)

Howe required Meadows to acknowledge in writing that her failure to "abide by

any one of [the conditions] … [would] result in her immediate dismissal."  (*Id.*)

Meadows did so on April 18, 2011, and she thereafter returned to work.[2]

(*See* ECF #14-11.)

---

[2] Howe first listed these conditions in a letter to Meadows dated March 28, 2011. Meadows refused to sign that letter because the listed conditions were preceded by a description of Meadows' conduct, and Meadows found the description to be inaccurate. (*See* Meadows March 20, 2011, Letter, ECF #14-10.)  Howe then revised the letter – to eliminate the disputed descriptions but leaving intact the conditions that Meadows had to fulfill – and Meadows signed the revised letter on April 18, 2011. (*See* ECF #14-11.)

Meadows says that following her return, there were "no more sexual comments" and "no more sexual jokes." (*Id.* at 106, Pg. ID 176.)  Meadows also says that she did not hear any offensive racial comments after she returned.  (*See id.* at 108-109, Pg. ID 176.)  Meadows contends, though, that Belleperche did continue to stare at her.  (*See id.* at 106-107, Pg. ID 176.)

**D.   Meadows Files a Charge of Discrimination With the EEOC and MDCR**

On March 26, 2011 (before Meadows had received Howe's letter inviting her back to work under certain conditions), she filed a Charge of Discrimination with the EEOC and MDCR. (*See* the "March 26 Charge," ECF #14-6.)  In the March 26 Charge, Meadows wrote that she was "a Black woman and [she] believe[d] [she had] been subjected to unwanted sexual harassment around October 1, 2010, December 16, 2010, and December 21, 2010…by [her] male supervisor." (*Id.*)  Meadows also alleged that she was subjected to disciplinary action "on March 14, 2011 based on [her] sex and race." (*Id.*)  Meadows wrote that she "was involved in a verbal altercation with a White co-worker [Manakis]" and that after the confrontation she was sent home "while [Manakis] was allowed to continue working." (*Id.*)

**E.   Howe Fires Meadows, and Meadows Files a Second Charge of Discrimination**

On August 4, 2011, Meadows refused to follow "team leader" John Jolly's instruction to pack certain parts. (*See* Meadows Dep. at 114, Pg. ID 178.)

Meadows told Jolly that it was not her job to pack parts. (*See id.*) Meadows thereafter went to Belleperche, who supervised both Jolly and Meadows, to complain that Jolly had ordered her to perform a task that, Meadows believed, fell outside of her "job description." (*Id.* at 114-115, Pg. ID 178.) Belleperche told Meadows to pack parts as Jolly had instructed. (*See id.* at 116, Pg. ID 178.) Meadows still refused to do so, and she "went straight to [Howe]" to complain about the requirement that she pack parts. (*Id.* at 116-117, Pg. ID 178.) According to Meadows, Howe immediately fired her when she presented her complaint to him. (*See id.* at 117-118, Pg. ID 178-179.)

Howe remembers this incident differently. Howe says that he did not fire Meadows immediately, but that he instead explained to Meadows that "[t]here's nothing wrong or unusual about [Jolly] asking [Meadows] to pack some parts." (Howe Dep. at 99, Pg. ID 148.) According to Howe, he fired Meadows only after she persisted in her refusal to follow directions from her superiors and failed to communicate with him in an appropriate tone and manner. (*See id.*) Howe says that "ultimately [he] made a decision [to fire her] because [he] could not get her calmed down in 10 to 12 minutes …and [he could not] have an employee challenging [his] authority, [his] position, and refusing to take simple work instructions that are well within the definition of the scope of work which she's hired to do." (*Id.* at 99-100, Pg. ID 148-149.) Howe contends that before this

13

incident he was not predisposed to fire Meadows; in fact, he called her "one of the best employees [Wahler] ever had." (*Id.* at 80, Pg. ID 136.)

On August 5, 2011 – the day after Howe fired Meadows – Meadows filed a second Charge of Discrimination with the EEOC and MDCR. (*See* the "August 5 Charge," ECF #15-14.)   In the August 5 Charge, Meadows alleged that "[o]n August 4, 2011, [she] was discharged without reason.  Non-Black and non-male employees are not subjected to such unfair treatment." (*Id.*)  Meadows wrote that she "believe[d] [Wahler's] decision to discharge [her] was based solely on [her] race, sex, and in retaliation for [her] filing a previous complaint of discrimination" against Wahler. (*Id.*)

## PROCEDURAL HISTORY AND CLARIFICATION OF MEADOWS' CLAIMS AGAINST WAHLER

Meadows filed her four-count Complaint against Wahler on April 30, 2013. (*See* Complaint, ECF #1.)   In Count I of the Complaint, entitled "Sexual Harassment," Meadows alleges that Wahler violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 *et seq.* ("Title VII"), and Michigan's Elliot-Larsen Civil Rights Act, MCL § 37.2101 *et seq.* (the "ELCRA"), by allowing its supervisory employees to engage in sexually-harassing conduct that was "sufficiently severe or pervasive enough to alter the conditions of [Meadows'] employment and create an abusive working environment." (Compl. at ¶19.)

14

In Count II, entitled "Racial Harassment," Meadows alleges that Wahler violated Title VII and the ELCRA by allowing its supervisory employees to engage in racially-harassing conduct that was "sufficiently severe or pervasive enough to later the conditions of [Meadows'] employment and create an abusive working environment." (Compl. at ¶25.)

In Count III, entitled "Hostile Work Environment," Meadows alleges that Wahler violated Title VII and the ELCRA by creating or tolerating a workplace "filled with intimidation, insult or ridicule sufficiently severe or pervasive enough to alter the conditions of [Meadows'] employment and create an objectively hostile and abusive working environment." (Compl. at ¶30.)   Meadows' counsel acknowledged at oral argument that Count III is duplicative of Counts I and II in that Count III is simply a combination of the sexually-hostile work environment claim from Count I with the racially-hostile work environment claim from Count II.

In Count IV, mis-labeled as Count III and entitled "Retaliatory Discharge," Meadows alleges that Wahler violated Title VII and the ELCRA by firing her, "at least in part, in retaliation for the filing and prosecution" of the March 26 Charge. (*Id.* at ¶¶35, 39.)

Finally, Meadows does not allege in her Complaint that Wahler acted unlawfully when Howe decided to keep her out of work for a period of time in

March 2011 – while Young investigated her allegations of harassment.  Indeed, Meadows' Complaint nowhere mentions nor challenges that action by Howe.  This clarification of Meadows' claims is important because in opposition to Wahler's summary judgment motion, Meadows argues that she has established a "prima facie case" that her March 2011 "suspension" by Howe was the result of race and/or gender discrimination.  (*See* Meadows Resp. Br. at 26-29, Pg. ID 246-249.) Meadows' Complaint, however, *does not* include a discrimination claim related to her suspension; such a claim is simply not before the Court.  Likewise, while Meadows alleged in the August 5 Charge that she was unlawfully terminated based upon her race and gender, she does not include such a claim in her Complaint.  The only count of the Complaint challenging Meadows' firing – Count IV – rests entirely upon the theory that Wahler discharged Meadows for engaging in protected activity (i.e. the filing of the March 26 Charge), not on the theory that Wahler fired Meadows due to her race or gender.

Wahler has filed a Motion for Summary Judgment.  (*See* ECF #14.)  The Court heard oral argument on the motion on August 5, 2014.

## **GOVERNING LEGAL STANDARD**

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact...." *U.S. SEC v. Sierra Brokerage Services, Inc.,* 712 F.3d 321, 326–27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.,*

16

477 U.S. 242, 251–52 (1986)) (quotations omitted). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson,* 477 U.S. at 252.   However, summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-252.  When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.*  Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge…" *Id.* at 255.

## <u>ANALYSIS</u>

**A.    Wahler Is Not Entitled to Summary Judgment on Meadows' Title VII Sexual Harassment Hostile Work Environment Claim (Counts I and III)**

"Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult."   *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 332-333 (6th Cir. 2008).  An employer who fails to provide an environment free from such harassment may be liable for damages under Title VII. "In order to establish a prima facie case of a hostile work environment based on sexual harassment [under Title VII], [a] plaintiff must show by a preponderance of the evidence: (1) that she was a member of a protected class; (2) that she was

17

subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; (4) that the harassment unreasonably interfered with her work performance by creating a hostile, offensive, or intimidating work environment; and (5) that there is a basis for employer liability." *Thornton v. Federal Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008).

Wahler argues that Meadows' sexual harassment hostile work environment claim fails because the alleged harassment by Belleperche "was neither severe nor pervasive" and "did not change [Meadows'] terms and conditions of employment." (Wahler's Br. at 18, Pg. ID 109.)  Wahler stresses that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'" and are thus insufficient to give rise to employer liability under Title VII.  (*Id.* at 16, pg. ID 107, quoting *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998).) Wahler insists that the incidents involving Belleperche "were few and isolated and occurred over a four-month period ending with Meadows receiving employment with Wahler and a pay raise." (*Id.* at 18, Pg. ID 109.)  But the evidence Meadows presented, when viewed in her favor, creates a material factual dispute as to whether the harassment by Belleperche was severe or pervasive enough to establish a hostile work environment.

"To determine whether a work environment is 'hostile' or 'abusive,' courts look at the totality of the circumstances.  The factfinder must evaluate the conduct at issue by both an objective and subjective standard."  *Hawkins*, 517 F.3d at 333 (internal citations omitted).  To satisfy these standards a plaintiff must "establish both that the harassing behavior was 'severe or pervasive' enough to create an environment that a reasonable person would find objectively hostile or abusive, and that he or she subjectively regarded the environment as abusive."  *Id.*

"The determination of whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is not susceptible to a mathematically precise test."  *Id.* (internal quotation marks omitted).  "A nonexhaustive list of factors for the court to consider include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Id.* (internal quotation marks omitted).  In addition, "sexual comments and harassing acts of a continual nature are more likely to be deemed pervasive," and "harassment involving an element of physical invasion is more severe than harassing comments alone."  *Id.* at 333-334 (internal quotation marks omitted).

"Whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is quintessentially a question of fact."  *Id.* at 333

(quotation marks omitted).  "Summary judgment is appropriate *only* if the evidence is so one-sided that there is no genuine issue of material fact as to whether there was a hostile work environment."  *Id.* (emphasis added).

Here, Meadows has established a genuine issue of material fact as to whether she was subject to a hostile work environment at Wahler.  As described in detail above, Meadows testified that Belleperche subjected her to repeated unwanted physical contact – including brushing against her breast, putting a dollar bill in her back pocket, pulling on her belt loop, and feeding her crackers – and that Belleperche made sexually harassing comments to her on a continual basis.  A reasonable person could certainly conclude that Belleperche's physical and verbal conduct created a hostile and abusive atmosphere.  And Meadows insists that this conduct humiliated her in front of her co-workers and that she subjectively regarded the conduct as abusive.  The Sixth Circuit has repeatedly held that evidence like that presented by Meadows is sufficient to establish a material factual dispute as to the existence of a hostile work environment.  *See Williams v. General Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999) (holding that harassing sexual comments and one act of touching that contained an element of physical invasion "at minimum …. raise[d] a question of fact for the jury"); *Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 352 (6th Cir. 2005) (holding that employer was not entitled to summary judgment where plaintiff presented evidence of "an

ongoing pattern of unwanted conduct and attention"); *Hawkins*, 517 F.3d at 333 (holding that question of fact existed on hostile work environment claim in part because conduct was alleged to be "ongoing and continual" and involved "acts of touching and unwelcome physical contact that establish an element of physical invasion").

Wahler next argues that even if Belleperche's misconduct created a hostile work environment, it (Wahler) is nonetheless entitled to summary judgment because it promptly and "effectively remedied the alleged harassment." (*See* Wahler Br. at 18-19, Pg. ID 109-110.)   The Court agrees that Wahler acted promptly, and that it effectively remedied the harassment, but these facts, *standing alone*, are plainly *not* a sufficient defense to Meadows' Title VII claim.

In support of its no-liability-because-we-remedied-the-harassment defense, Wahler relies upon the Sixth Circuit's decision in *Wathen v. General Electric Company*, 115 F.3d 400 (6th Cir. 1997).   As Wahler correctly notes, *Wathen* fairly stands for the proposition that "an employer avoids liability for hostile work environment claims if it adequately investigated and took prompt remedial action upon notice of the alleged harassment." (Wahler Reply Br., ECF #16 at 1-2, Pg. ID 354-55.)   The problem for Wahler is that this aspect of *Wathen* was abrogated by the Supreme Court's decisions in *Ellerth* and *Faragher*.   In those cases, the

21

Supreme Court held that an employer may avoid liability for a supervisor's[3] creation of a hostile work environment where it establishes *both* "(a) that [it] *exercised reasonable care to prevent* and correct promptly any sexually harassing behavior, *and* (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765 (emphasis added); *Faragher*, 524 U.S. at 778. After *Ellerth* and *Faragher*, it is crystal clear that under Title VII an employer may no longer avoid liability for a supervisor's harassment *solely* by taking effective remedial action.

Indeed, the Sixth Circuit has expressly recognized that *Ellerth* and *Faragher* abrogated the rule from *Wathen* on which Wahler relies. In *Williams, supra*, the Sixth Circuit explained that *Ellerth* and *Faragher* "invalidate[d] a portion of prior caselaw in [the Sixth Circuit] and require that [courts] recast the analytical framework for a hostile-work-environment claim based on a supervisor's actions." *Williams*, 187 F.3d at 560.[4] After *Faragher* and *Ellerth*, "*it is no longer enough*

---

[3] It is undisputed that Belleperche – Wahler's plant manager who had the authority to send Meadows home from work – was Meadows' supervisor. (*See* Meadows Dep. at 24, Pg. ID 155; Howe Dep. at 31, Pg. ID 329 and 88, Pg. ID 341.) Indeed, Wahler emphasized Belleperche's status as Meadows' supervisor in its written submissions to the Court. (*See* Wahler Reply Br. at 7, Pg. ID 360.)

[4] There is no doubt that the portion of *Wathen* cited by Wahler lies within the "prior caselaw" that *Ellerth* and *Faragher* abrogated. The court in *Wathen* held that its prior decision in *Kauffman v. Allied Signal, Inc*., 970 F.2d 178, 184 (6th

*for an employer to take corrective action*; employers now have an *affirmative duty* to prevent sexual harassment by supervisors." *Id.* at 561 (emphasis added). Thus, Wahler is not entitled to summary judgment solely on the basis that it promptly and effectively remedied the harassment.

But Wahler would be entitled to summary judgment if it could *also* establish that it took effective steps to prevent the harassment. Wahler has failed to do so. In fact, Wahler has presented very little evidence concerning any affirmative steps it may have taken to prevent sexual harassment.

The sole evidence in the record concerning harassment prevention by Wahler is the fact that the Wahler Handbook contained the Policy (recited above). But the mere existence of the Policy does not establish that Wahler took sufficient steps to prevent harassment. First, the Policy does not satisfy the Sixth Circuit's minimum requirements for *Ellerth/Faragher* purposes. As that court has explained: "While there is no exact formula for what constitutes a 'reasonable' sexual harassment policy, an effective policy *should at least*: (1) require supervisors to report incidents of sexual harassment; (2) permit both informal and formal complaints of harassment to be made; (3) provide a mechanism for

---

Cir. 1992) (employer not liable for hostile work environment if it took prompt and effective remedial action), was "dispositive" on the question of the employer's liability. *Wathen*, 115 F.3d at 15. In *Williams*, the court specifically cited the employer liability standard from *Kauffman* as the one that *Ellerth* and *Faragher* "invalidate[d]." *Williams*, 187 F.3d at 560-61.

bypassing a harassing supervisor when making a complaint; and (4) and provide for training regarding the policy." *Clark*, 400 F.3d at 349-350 (emphasis added). Here, the Policy does not require supervisors to report incidents of sexual harassment, never mentions any training, and does not provide a clear mechanism for bypassing a harassing supervisor when making a complaint.[5]

Second (and just as importantly), Wahler has not presented any evidence concerning how it actually implemented or enforced the Policy. For instance, while the record indicates that Meadows received the Policy, there is no evidence

---

[5] The reporting procedures under the Policy are not entirely clear. The Policy seems to create a two-phase reporting process – an "informal" phase followed by a "formal" phase. The Policy first provides that employees "should report" harassment to their "immediate supervisor and Resident Vice-President." (Wahler Handbook at 10, Pg. ID 183.) The Policy then stresses that Wahler has an "open door policy" under which employees may bring harassment "complaints to [their] supervisor for resolution." (*Id.* at 11, Pg. ID 184.) The Policy also provides that "where the complaint has not been satisfactorily resolved [by the] informal [process]," Wahler will undertake "a formal procedure" to review the complaint. (*Id.*) The supervisor may also play a role in this "formal procedure." The formal process begins with the employee submitting his or her complaint to unidentified "management or [its] designee" with a separate request for a meeting. (*Id.*) If the "problem is not resolved during this meeting management or [its] designee will give the employee a written resolution…" (*Id.*) If the employee is "not satisfied" with this written resolution, the employee may then "submit a written request for review of the complaint … to the President or his/her designee." (*Id.*) The President (or his/her designee) may then "call a further meeting to explore the problem," a meeting that includes the employee's "immediate supervisor." (*Id.*) Given the language of the Policy, it would not be unreasonable for an employee who wishes to make a harassment complaint against his supervisor to conclude that (1) she must present her complaint informally before commencing the formal process and (2) the informal process requires a report to her supervisor. Nor would it be unreasonable for an employee to conclude that the supervisor would be involved in the formal process.

to establish how many other Wahler employees, if any, also received, or were told about, the Policy. There is no evidence that the Policy was posted in Wahler's facility. Nor does the record contain any evidence that, prior to Meadows' complaints of harassment, Wahler ever offered any training related to the Policy or to harassment prevention in general. And the anecdotal evidence concerning the environment at Wahler before Meadows complained – including reports of recurring vulgar and offensive behavior by a number of Wahler employees (*see, e.g.* Young's Investigative Report, ECF #14-7; William Tolliver's Charge of Discrimination, ECF #15-15; John Jolly Dep., ECF #15-11, 25-27, Pg. ID 304-306) – further creates a question as to whether Wahler acted reasonably to prevent harassment. Simply put, there is a material question of fact as to whether, prior to Meadows' complaints, Wahler "promulgated and enforced" a sufficient anti-harassment policy, *see Thornton*, 530 F.3d at 456, and otherwise acted reasonably to prevent sexual harassment. Accordingly, Wahler is not entitled to summary judgment on the *Ellerth/Faragher* affirmative defense. [6]

---

[6] This affirmative defense is only available where the alleged harassment does not "culminate[] in a tangible employment action, such as a discharge, demotion, or undesirable reassignment." *Ellerth*, 524 U.S. at 765. In light of the Court's ruling that Wahler has thus far failed to satisfy the elements of the defense, the Court does not reach Meadows' argument that Wahler took a tangible employment action against her – thereby rendering the defense unavailable – when Howe ordered her to stay away from the office and plant for a period of time in March 2011.

**B.     Wahler Is Entitled to Summary Judgment on Meadows' ELCRA Sexual Harassment Hostile Work Environment Claims (Counts I and III)**

Wahler argues that it is entitled to summary judgment on Meadows' sexual harassment hostile work environment claims under the ELCRA because it promptly and effectively remedied Meadows' alleged harassment.  (*See* Wahler Br. at 18-19, Pg. ID 109-110.)   While this argument was insufficient to defeat Meadows' Title VII claim, it does defeat her ELCRA claim.  Unlike under Title VII, a plaintiff asserting a hostile work environment claim under the ELCRA "can hold [an] employer liable … for [her] supervisor's harassing behavior *only if* [*the plaintiff*] shows that the employer failed to take prompt and adequate remedial action after having been put on notice of the sexual harassment."  *Collette v. Stein-Mart, Inc.*, 126 Fed. App'x 678, 687-688 (6th Cir. 2005) (internal quotation marks omitted) (emphasis added); *see also Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 916 (Mich. 2000) (reiterating "requirement that a plaintiff [asserting an ELCRA hostile work environment claim] prove that the employer failed to take prompt remedial action upon notice of the creation of a hostile work environment").

Meadows has failed to satisfy her burden here.  As the Sixth Circuit has explained, "[t]he most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified.  By doing so, the employer puts all employees on notice that it takes such allegations seriously and will not tolerate

26

harassment in the workplace." *Collette,* 126 Fed. App'x at 686 (internal quotation marks and citation omitted).  That is exactly what Wahler did.  Within two days of Meadows' complaints, Wahler hired outside counsel to investigate her accusations, interview Wahler employees, and draft a detailed report that included recommendations for improvements.  (*See* ECF #14-7.)

Wahler then promptly acted to correct the alleged harassing behavior by, among other things, warning Belleperche that he must immediately cease all harassing activities or be fired and by having the MDCR present sexual harassment prevention training for its employees.  Notably, Meadows admitted that the sexual/racial conduct and comments that she found offensive stopped almost entirely when she returned to work in April 2011 (*see* Meadows Dep. at 106-109, Pg. ID 176), and her admission underscores the effectiveness of Wahler's response to her allegations.[7]  Because Wahler effectively remedied Meadows' complaints of

---

[7] Meadows appears to argue that Wahler's training was not effective because in 2012, a Wahler employee named Jeffrey Phill ("Phill") made inappropriate racial comments at a going-away party for another Wahler employee.  (*See* Meadows Resp. Br. at 13, Pg. ID 241.)  However, Phill's comments occurred months after Wahler's training by the MDCR, and Phill's far-removed and isolated incident of misconduct falls far short of showing that the Wahler's response was ineffective – especially when Meadows admitted that the misconduct essentially ceased after she returned to work at Wahler in April 2011.  Moreover, Phill's alleged misconduct occurred many months after Meadows left Wahler, and thus Phill's conduct is entirely irrelevant as to whether Wahler's response to Meadows' allegations was effective *as to Meadows*.

sexual harassment, Wahler is entitled to summary judgment on Meadows' ECLRA
sexual harassment hostile work environment claim.

## C.   Wahler Is Entitled to Summary Judgment on Meadows' Racial Hostile Work Environment Claims (Counts II and III)

In order to establish a prima facie case on her racial harassment hostile work
environment claims under both Title VII and the ELCRA, Meadows must
establish, among other things, that the harassment was "sufficiently severe or
pervasive to alter the conditions of [her] employment and create an abusive
working environment." *See, e.g., Reed v. Proctor  & Gamble Mfg. Co.*, 556 Fed.
App'x 421, 431-432 (6th Cir. 2014) (Title VII); *see also In Re Rodriguez*, 487 F.3d
1001, 1010 (6th Cir. 2007) (ELCRA).  Meadows has failed to do so.

Meadows has produced no evidence that she experienced "severe or
pervasive" racial harassment.  Meadows stresses that certain Wahler employees
confirmed to Young (during his investigation) that racial jokes were made in the
workplace.  (*See, e.g.*, Meadows Resp. Br. at 13-14, Pg. ID 233-234 and 23, Pg. ID
243.) However, Meadows has not cited any evidence that she personally heard the
overwhelming majority of these comments or that she even knew about them while
working for Wahler. (*Id.*)  Instead, Meadows argues that the walls at Wahler were
"paper thin" and that the "human voice" could "be heard [through the walls] when
spoken in a normal tone." (Meadows Resp. Br. at 15, Pg. ID 235.)  But Meadows'
description of the walls' density is no substitute for actual evidence that she, in

28

fact, heard or knew about the racial comments and jokes that she now claims made her environment a hostile one.   Indeed, "[c]omments or conduct of which a plaintiff had no knowledge cannot be said to have made [an] work environment hostile." *Armstrong v. Whirlpool Corporation*, 363 Fed App'x 317, 328 (6th Cir. 2010).

Finally, the very few racial comments that Meadows did hear, such as Belleperche's reference to Wahler's multi-cultural workforce as a "rainbow," are too isolated and not sufficiently severe to establish a hostile working environment. *See, e.g., Reed*, 556 Fed. App'x at 433 (holding that isolated "offensive utterance[s]" that did not include direct threats did not create a racially hostile work environment); *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 513 (6th Cir. 2011) (holding that racially insensitive statements such as "calling Jesse Jackson and Al Sharpton 'monkeys' and saying that black people should 'go back to where [they] came from' are certainly insensitive, ignorant, and bigoted" but that they cannot form the basis of a hostile work environment claim because "they more closely resemble a 'mere offensive utterance' than conduct that is 'physically threatening or humiliating'"").   Wahler is thus entitled to summary judgment on Meadows' claims for racially harassment hostile work environment.

**D.      Wahler is Entitled to Summary Judgment on Meadows' Retaliatory Discharge Claim (Count IV)**

To establish a prima facie claim for retaliation under Title VII, Meadows must establish that "1) [s]he engaged in protected conduct, (2) [Wahler] had knowledge of [her] protected activity, (3) [Wahler] took an adverse employment action against [her], and (4) a causal connection exists between the protected activity and the adverse employment action." *Reed*, 556 Fed. App'x at 430. The requirements under the ELCRA are similar. *See In Re Rodriguez*, 487 F.3d at 1011) ("A plaintiff alleging retaliation in violation of the ELCRA must establish the following elements of a prima facie case: (1) that the plaintiff engaged in a protected activity, (2) that this was known by the defendant, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action") (quoting *Barrett v. Kirtland Comm. Coll.,* 628 N.W.2d 63, 70 (Mich. App. 2001)). Moreover, "[t]o establish causation [under the ELCRA], the plaintiff must show that his participation in activity protected by the ELCRA was a significant factor in the employer's adverse employment action, not just that there was a causal link between the two." *Id.*

Meadows alleges that she was fired because she filed the March 26 Charge with the EEOC, but she has failed to establish a causal connection between that

30

filing and her discharge.[8]  Meadows attempts to establish causation by arguing that Howe "was predisposed to discriminate against [her] due to her complaints of harassment" (Meadows Resp. Br. at 22, Pg. ID 250), but she has not identified any evidence in the record to support such a finding.  In fact, the evidence before the Court shows that Howe specifically instructed Belleperche *not* to retaliate against Meadows for her complaints of harassment and discrimination.  (*See* ECF #14-8.)  Moreover, the evidence shows that, far from being predisposed to discriminate against Meadows, Howe considered her "one of the best employees [Wahler] ever had."  (Howe Dep. at 80, Pg. ID 136.)

Furthermore, Meadows cannot establish the required causation based upon the temporal proximity between the March 26 Charge and her August firing.  The Sixth Circuit has held that multi-month gaps between protected activities and discharge – like the over four-month gap that exists here – create no more than a "loose temporal proximity" that is "insufficient to create a triable issue [on

---

[8] In Meadows' response to Wahler's Motion, she argues for the first time that she was discharged not just for filing the March 26 Charge, but also for her "presentation of allegations of racial and sexual harassment to company management," which Meadows says led to Wahler imposing "more onerous reporting requirements" on her related to disputes Meadows had with her supervisors and co-workers.  (Meadows Resp. Br. at 21-22, Pg. ID 249-250.)  But Meadows' Complaint does not contain any allegations related to this new theory.  In fact, Meadows' "retaliatory discharge" claim in her Complaint is explicitly and exclusively tied to her filing of the March 26 Charge and no other conduct.  (*See, e.g.* Compl. at ¶¶35, 39.)  Meadows' new allegations are therefore not part of her current action.

causation].'' *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (two to five month gap between protected activities and discharge insufficient to create factual dispute on causation); *see also Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) (finding insufficient temporal proximity to support an inference of retaliation where employer discharged plaintiff within four months of the protected conduct).[9]

For these reasons, Meadows has failed to establish a material factual dispute as to whether there was a causal connection between the March 26 Charge and her dismissal.   Wahler is therefore entitled to summary judgment on Meadows' retaliatory discharge claim (Count IV of Meadows' Complaint).

### E.   The Court Will Not Allow Meadows to Assert a Discrimination Claim Based Upon Her Suspension

A plaintiff may not assert a new claim or theory of recovery in response to a summary judgment motion. *See, e.g., Tucker v. Union of Needletrades, et al.*, 407 F.3d 784, 788 (6th Cir. 2005).  Here, as described above, Meadows' opposition to Wahler's motion raises a new discrimination claim: that in March 2011, Wahler unlawfully suspended her based upon her race and/or gender.   Meadows'

---

[9]  It is further undisputed that (a) Meadows accused only Belleperche, and not Howe, of misconduct in the March 26 Charge and (b) Howe, alone, made the decision to terminate Meadows' employment in August.   ''It is difficult to believe that [Howe] would wait so long to retaliate [for the March 26 Charge] that did not implicate [him] in any way.''  *Kroll v. Disney Store, Inc.*, 899 F. Supp. 344, 348 (E.D. Mich. 1995.)

suspension is never mentioned in her Complaint, and the Complaint plainly does not contain a claim seeking recovery based upon the suspension.  The Court will not, at this late stage, allow Meadows to assert a claim based upon her suspension.

## <u>CONCLUSION</u>

For all of the reasons stated in this Opinion and Order, Wahler's Motion for Summary Judgment (ECF #14) is hereby **GRANTED IN PART AND DENIED IN PART**.  Wahler is entitled to judgment in its favor on all counts of the Complaint other than that portion of Count I asserting a claim for sexual harassment hostile work environment under Title VII and that portion of Count III asserting a claim for sexual harassment hostile work environment under Title VII.

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated:  September 12, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 12, 2014, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113